IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RUSSELL THOMAS,                          )
                                         )
            Plaintiff,                   )
                                         )
     v.                                  )          Civil Action No. 11-555-GMS
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
            Defendant.                   )
                                         )

## MEMORANDUM

### I.      INTRODUCTION

The plaintiff, Russell Thomas ("Thomas"), filed this action under 42 U.S.C. § 405(g)

seeking review of a final decision by the defendant, Michael J. Astrue, the former Commissioner

of Social Security ("the Commissioner"),[1] which denied Thomas' claim for Disability Insurance

Benefits ("DIB"). (D.I. 2 at 1.) Thomas applied for DIB on April 17, 2007, claiming disability

beginning January 1, 2006. (D.I. 11 at 110, 115.) The Social Security Administration ("SSA")

denied his application both initially and on reconsideration. (*Id.* at 67–71, 73–77.) Thomas

subsequently requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 80.) SSA

granted the request and a hearing was held on February 4, 2009. (*Id.* at 6–25.) Thomas and

vocational expert ("VE") Tony Melanson appeared and testified at the hearing. (*Id.*)

On March 27, 2009, ALJ Melvin D. Benitz issued a decision finding that Thomas was not

disabled within the meaning of the Social Security Act because he retained the residual

---

[1] Carolyn W. Colvin became the Commissioner of the Social Security Administration (the "SSA") on February 13, 2013, after briefing began. Although, under FED. R. CIV. P. 25, Carolyn W. Colvin should be substituted for Michael J. Astrue, pursuant to 42 U.S.C. § 405(g), no further action is necessary to continue this action.

functional capacity ("RFC") to perform work that exists in significant numbers in the national economy. (*Id.* at 11–17, 24.) Thomas filed a request to have the matter reviewed by the Appeals Council but the request was denied. (*Id.* at 1–3, 5.) Thomas then filed this action on June 22, 2011. (D.I. 2 at 1.) Presently before the court are the parties' cross-motions for summary judgment. (D.I. 13, 15.) For the reasons that follow, the court will: (1) deny Thomas' motion for summary judgment and (2) grant the Commissioner's motion for summary judgment.

## II.    BACKGROUND

Thomas was born on February 26, 1959. (D.I. 11 at 23, 110.) He possesses an eighth grade education. (*Id.* at 30, 47.) Thomas worked as a concrete mason—a job that entails heavy, skilled labor for more than twenty years. (*Id.* 30, 46, 157–58.) On March 29, 2002, Thomas was involved in a work related accident.[2] (*Id.* at 31, 270.) As a result, he sustained injuries to his left knee, left shoulder, neck, back, and both hands. (*Id.* at 18–23, 31, 58–60.) He has not returned to work since the accident. (*Id.* 18, 30–31.)

Thomas first filed an application for DIB on October 4, 2002. (*Id.* at 57.) SSA denied his application. (*Id.*) Thomas applied again for DIB on April 28, 2003. (*Id.*) Again, SSA denied his application. (*Id.*) After requesting and receiving a hearing before an ALJ, Thomas obtained a partially favorable decision on October 29, 2004, which deemed him disabled and entitled to benefits from his alleged onset date of March 29, 2002 through November 3, 2003. (*Id.* at 53–62.) His DIB payments expired on January 31, 2004 and were offset by the amount of workers' compensation benefits he received concurrently. (*Id.* at 31–32, 43–45, 62.)

On April 17, 2007, Thomas applied again for DIB, alleging disability beginning January 1, 2006. (*Id.* at 110–16.) In support of his application, Thomas submitted medical records

---

[2] According to Thomas, a truck carrying concrete inadvertently toppled a steel beam, which fell onto the hole in which he was standing. (D.I. 11 at 31, 270.) The beam struck him in the top of the left shoulder. (*Id.*)

documenting several persistent medical issues, including impairments of the left knee, left shoulder, neck, back, and hands, as well as Crohn's disease, migraine headaches, and depression. (*Id.* at 183–281.)

## A. Medical Records

### 1. Left Knee Impairment

On March 11, 2003, Thomas underwent an arthroscopic partial medial meniscectomy on his left knee. (*Id.* at 32, 58.) Peter Bandera, M.D. managed Thomas' post-operative treatment. (*Id.* at 204–18.) In several clinical examination reports from 2003 to 2008, Dr. Bandera noted tenderness in Thomas' left knee. (*Id.* at 15, 205–11, 214, 216.) He also reported that Thomas' knee would give out when subjected to taxing activities like climbing stairs, and that Thomas was unable to assume a mid-squat position. (*Id.* at 15, 209, 268, 270.) Dr. Bandera administered therapeutic injections on multiple occasions in 2006 and 2007 to mitigate Thomas' pain and improve his ambulation. (*Id.* at 15, 210, 273.) Those injections were at least partially successful. (*Id.* at 204, 210, 273.) Though pain, tenderness, and trace effusion persisted through January 2008, Thomas' course of therapy and medication enabled him to resume "basic activities of daily living." (*Id.* at 266–70, 272–73.)

By April 2008, Dr. Bandera noted that the swelling and tenderness in Thomas' left knee had reduced. (*Id.* at 15, 267.) Dr. Bandera did not mention Thomas' left knee during his September 8, 2008 re-evaluation. (*Id.* at 266.) In an RFC questionnaire dated December 11, 2008, Dr. Bandera suggested that Thomas could twist, stoop, squat, and climb ladders and stairs "occasionally," defined as between 6% and 33% of an eight-hour workday, yet he also indicated that Thomas would neither be able to sit nor stand for more than two hours total on a given day. (*Id.* at 283, 285.)

On February 4, 2009, Thomas testified that, due to lingering knee issues, he has difficulty sitting in one spot for long periods of time and that his knee occasionally gives out when he walks. (*Id.* at 41.) He estimated the furthest he can walk without stopping is five blocks. (*Id.*) Thomas also testified, however, that he has no difficulty standing in place, that he is able to drive his car on a daily basis, and that his knee "feels pretty good." (*Id.* at 39, 41, 47.)

### 2. Left Shoulder, Neck and Back Impairments

On April 21, 2003, Lewis Sharps, M.D. performed an arthroscopic acromioplasty procedure to repair a frank tear of the rotator cuff in Thomas' left shoulder—an injury he sustained as a result of his March 2002 work accident. (*Id.* at 12, 31, 185, 270.) Dr. Bandera managed Thomas' shoulder, neck, and back treatment after surgery. (*Id.* at 204–18, 266–81.)

In June and July 2003, Dr. Bandera examined Thomas and noted continuing cycles of pain in his left shoulder, neck and back. (*Id.* at 211, 214, 216.) He also observed tightness, guarding, spasms, a reduction of strength, and a limited range of motion. (*Id.*) In response, Dr. Bandera prescribed muscle relaxants, narcotic pain medication, and physical therapy. (*Id.* at 34–35, 211, 214, 216.) Additionally, he ordered an MRI on Thomas' spine. (*Id.*) The MRI revealed active and chronic degenerative changes in multiple areas of the spine, as well as increasing lumbar facet arthropathy, which, according to Dr. Bandera's clinical note of July 30, 2003, was consistent with Thomas' pain pattern. (*Id.* at 12, 186, 211.) Thomas has not undergone a more recent imaging study of his shoulder, back, or neck. (*Id.* at 20.)

Dr. Bandera examined Thomas again on January 11, 2006, noting that Thomas complained of increased pain relative to his neck, back, left knee and left shoulder. (*Id.* at 12, 210.) He also observed recurring spasms, guarding and joint tenderness. (*Id.*) Dr. Bandera administered a local cortisone injection to mitigate Thomas' increased shoulder pain. (*Id.*) But

4

despite temporary relief, Thomas' pain, weakness, and difficulty using his left arm to push and pull persisted throughout 2006. (*Id.* at 12–13, 206–09.)

After another examination on March 14, 2007, Dr. Bandera suggested that Thomas might be able to increase his functional activities with medication support and "potentially execute lighter activity." (*Id.* at 13, 205.) But Thomas reported continuing symptoms, despite his medication regimen and an additional therapeutic injection in April 2007. (*Id.* at 13, 204.) On August 13, 2007, Dr. Bandera summarized Thomas' prior treatment and concluded that Thomas had reached the "plateau phase of care." (*Id.* at 276.) He cataloged Thomas' ongoing symptoms—including pain, diminished strength, and a limited range of motion in his shoulder, neck and back—and determined that Thomas continued to suffer from degenerative disc disease, cervical spondylosis, and lumbar facet arthopathy. (*Id.* at 13, 276.) Dr. Bandera's subsequent clinical notes in 2007 and 2008 documented the same symptoms and diagnoses. (*Id.* at 266–70, 272–73.) He discussed the possibility of additional neck and back surgery with Thomas in November 2007, but Thomas ·did not undergo another procedure due to more pressing gastrointestinal problems. (*Id.* at 33, 270.)

In an RFC questionnaire dated December 11, 2008, Dr. Bandera indicated that Thomas would be unable to lift or carry significant weight in a competitive work situation and that he would only occasionally be able to look down, look up, turn his head right or left, or hold his head in a steady position. (*Id.* at 284.) Dr. Bandera also characterized Thomas' musculoskeletal prognosis as "poor," and predicted his impairments could be expected to last at least twelve months. (*Id.* at 282.)

On February 4, 2009, Thomas testified that he continued to suffer pain in his neck, back, and shoulder, and that his back pain prevents him from standing and sitting for long periods of time, forcing him to spend most of the day lying down. (*Id.* at 37–42.)

### 3.     Wrist and Hand Impairments

In August 2007, Dr. Bandera noted that Thomas complained of pain in his left and right wrists. (*Id.* at 20, 276.)  Both wrists were stabilized in cock-up splints. (*Id.*)  In November and December 2007, Dr. Bandera observed that Thomas was having problems with material handling of the left arm. (*Id.* at 270.)  Dr. Bandera later opined, in his December 2008 RFC questionnaire, that Thomas would be completely unable to grasp, handle, or reach for objects with his left arm or hand during the workday, and that he would only be able to do so with his right arm or hand 40% of the time. (*Id.* at 285.)  Dr. Bandera did not, however, conduct an imaging study of Thomas' hand or wrist impairments. (*Id.* at 20.)

Thomas testified on February 4, 2009, that he still has pain and weakness in his hands and that he has difficulty lifting and gripping objects. (*Id.* at 35, 40–41.)

### 4.     Crohn's Disease

In addition to medical conditions arising from his work related injury, Thomas has a long history of Crohn's disease. (*Id.* at 13–14, 183, 193, 261.)  Prior to 2005, Thomas' gastroenterologist, Gaurav Jain, M.D., characterized his Crohn's disease as "stable" and "quiescent." (*Id.* at 261.) He had gone several years without a flare-up and his symptoms were controllable with steady doses of Imuran and Asacol. (*Id.* at 14, 261.) When Thomas' previous application for DIB was reviewed in October 2004, ALJ Antrobus made note of Thomas' Crohn's disease but did not deem it a severe impairment for purposes of DIB eligibility. (*Id.* at 58–62.)

On March 10, 2005, Thomas underwent an elective outpatient colonoscopy. (*Id.* at 220.) Biopsies of specimens obtained during the colonoscopy revealed idiopathic inflammatory bowel disease, Crohn's disease, and mild active chronic colitis. (*Id.* at 14, 220, 227–30.) The colonoscopy also revealed internal and external hemorrhoids, and a friable, irregular mass in the sigmoid colon, which, according to Dr. Jain, had grown considerably in the two years since Thomas' previous colonoscopy. (*Id.* at 14, 220–21.) In October and November 2005, Dr. Jain ordered a pelvic CT scan and another colonoscopy, which revealed a loss of vascular markings, numerous polyps, and a narrowed or possibly collapsed section of the colon, indicating a need for surgical resection. (*Id.* at 14, 193, 239.)

On January 23, 2006, Charles Hobbs, M.D. performed an abdominal colectomy with ileosigmoid anastomosis, a procedure to remove a portion of the colon. (*Id.* at 14, 193–94.) Dr. Hobbs noted that Thomas tolerated the procedure well and "had a fairly good postoperative course." (*Id.* at 193.) He was discharged on January 28, 2006. (*Id.* at 14, 193.) After a follow-up examination on February 7, 2006, Dr. Hobbs reported that Thomas had been doing well at home with increased activity and less pain. (*Id.* at 250.)

On February 18, 2006, however, Thomas was readmitted to the hospital with fever, abdominal pain, nausea, loss of appetite, and a significant amount of weight loss. (*Id.* at 14, 202.) A CT scan revealed inflammation around Thomas' pelvis, but x-ray, ultrasound, and lab reports were normal. (*Id.* at 14, 202, 253–54.) Following treatment, his appetite and bowel function returned. (*Id.* at 14, 202.) He was subsequently discharged on February 24, 2006. (*Id.*) Dr. Hobbs conducted a follow-up examination of Thomas on March 14, 2006 and no irregularities were noted. (*Id.* at 14, 249.)

Nearly one year later, on May 3, 2007, Thomas underwent a sigmoidoscopy, which was prompted by rectal pain and bleeding. (*Id.* at 14, 224.) The procedure revealed a moderately inflamed anastomosis with erythema and a few small ulcerations. (*Id.*) Dr. Jain prescribed Cipro. (*Id.*) Biopsies taken during the procedure revealed acute and chronic non-specific inflammation of the colonic and small bowel mucosa, as well as capillary congestion of the colonic mucosa, with no evidence of colitis. (*Id.* at 14, 224–26.)

On December 12, 2008, Dr. Jain completed a Crohn's and colitis RFC questionnaire, detailing Thomas' ongoing symptoms and prognosis. (*Id.* at 286–90.) Dr. Jain noted that Thomas continued to suffer from chronic diarrhea, fistulas, anal fissures, rectal pressure, and fatigue. (*Id.* at 286.) He also characterized Thomas' prognosis as "stable" and responded that Thomas' impairments have lasted or can be expected to last at least twelve months. (*Id.* at 287.)

On February 4, 2009, Thomas testified that his Crohn's symptoms remain severe and that they have intensified since his surgery. (*Id.* at 36.) He stated that he continues to suffer from fatigue, frequent episodes of diarrhea, hemorrhoids and fissures, and that his symptoms have forced him to wear an adult diaper at night. (*Id.* at 37.) Thomas also testified that, due to his Crohn's disease, he occasionally soils himself during the day. (*Id.* at 36.)

### 5.    Migraine Headaches

On June 24, 2004, Thomas visited Tabassum Salam, M.D. who treated him for back and rectal pain. (*Id.* at 15, 190.) After examining Thomas, Dr. Salam noted that Thomas' migraine headaches were well controlled with Imitrex and that his current medication regimen need not be changed. (*Id.* at 190.)

On August 13, 2007, Dr. Bandera noted that Thomas suffered from post-concussive syndrome with headaches three or four times per week. (*Id.* 15, 276.) Dr. Bandera did not

mention post-concussive syndrome or migraine headaches in any of his prior or subsequent clinical notes. (*Id.* at 204–11, 214, 216, 266–70, 272–73.) Additionally, Thomas did not allege a migraine headache-related impairment in his application for DIB or in his February 4, 2009 testimony before ALJ Benitz. (*Id.* at 15, 28–50.)

### 6. Depression

After his abdominal surgery in February 2006, Dr. Jain noted that Thomas showed signs of depression, including crying spells, lack of sleep, and loss of energy. (*Id.* at 16, 200.) Dr. Jain prescribed Lexapro and referred Thomas to a psychiatrist for further evaluation. (*Id.* at 16, 200–02.) Thomas stopped taking Lexapro because he did not like the side effects. (*Id.* at 200–01.)

In the RFC questionnaire he completed in December 2008, Dr. Jain opined that emotional factors contributed to the severity of Thomas' symptoms and functional limitations. (*Id.* at 287.) Dr. Bandera disagreed, opining that he did not believe emotional factors contributed to the severity of Thomas' symptoms and functional limitations. (*Id.* at 182.) The record does not indicate that Thomas currently seeks or receives mental health treatment. (*Id.* at 17.)

### B. Expert Opinions

#### 1. Dr. Bandera

Dr. Bandera has steadily maintained that, due to multiple lingering medical conditions, Thomas is disabled and unable to work. (*Id.* at 21, 206, 210–12, 214, 274, 276, 280–85.) On August 13, 2007, Dr. Bandera asserted that Thomas would be permanently unable to resume his employment as a cement finisher due to his inability to meet the physical demands of the job. (*Id.* at 21, 276.) In December 2008, Dr. Bandera concluded that Thomas' experience of pain and other symptoms would occasionally interfere with his attention and concentration; that Thomas would be incapable of even low stress work jobs; and that Thomas would need a job that allowed

him to shift positions and take breaks every hour for five to ten minutes. (*Id.* at 21, 283–85.) In addition, Dr. Bandera maintained that Thomas would be completely unable to grasp, reach, or perform fine manipulation with his left arm, hands and fingers, and that he would be absent more than four days per month. (*Id.*)

### 2. Dr. Jain

Dr. Jain likewise expressed an opinion that Thomas is "unable to work" in his RFC questionnaire dated December 2008. (*Id.* at 287.) Dr. Jain indicated that Thomas continued to suffer from chronic diarrhea, fistulas, anal fissures, and fatigue. (*Id.* at 286.) These symptoms, Dr. Jain assessed, would frequently be severe enough to interfere with Thomas' attention and concentration, and may require him to lie down and rest at unpredictable intervals. (*Id.* at 287.) Dr. Jain further predicted that Thomas would need three to four fifteen-minute, unscheduled restroom breaks during an eight-hour working day, and that Thomas could be expected to miss about four days of work per month. (*Id.* at 289–90.)

In the same questionnaire, however, Dr. Jain also assessed that Thomas is capable of low stress jobs. (*Id.* at 288.) He indicated that, although he would need a job that permits ready access to a restroom, Thomas could frequently lift and carry weights under ten pounds in a competitive work situation; he could occasionally carry as much as twenty pounds; and he could reliably perform low stress work even if it does not permit him to shift positions at will. (*Id.* at 288–89.)

### 3. Dr. Palandjian

On June 9, 2007, state agency physician R. Palandjian, D.O. reviewed Thomas' medical records. (*Id.* at 240–47.) Dr. Palandjian indicated that his findings were significantly different than the treating and examining physicians' conclusions. (*Id.* at 244.) He found that Thomas did

have the capacity to lift and/or carry twenty pounds occasionally; to lift and/or carry ten pounds frequently; and that he could sit, stand and/or walk for about six hours in an eight-hour workday. (*Id.* at 241.) Dr. Palandjian also found that Thomas was limited in his ability reach, push, and/or pull with his left upper extremities, but that he was unlimited in ability to manipulate or feel objects with his hands and fingers. (*Id.* at 241–42.) Additionally, Dr. Palandjian assessed that Thomas could occasionally climb, stoop, kneel, crouch, and crawl, and that he would have to avoid concentrated exposure to extreme heat, cold and vibration, which might exacerbate his back pain. (*Id.* at 242–43.)

According to Dr. Palandjian, the severity and duration of Thomas' symptoms were disproportionate and only partially consistent with his medically determinable impairments. (*Id.* at 244.) Dr. Palandjian also stated that he believed Thomas was only "partially credible." (*Id.* at 246.) In sum, he opined, it is "unlikely that [Thomas] can perform medium activity but [he] should be capable of sustaining light activity with [left upper extremity] restrictions. (*Id.*)

### 4. The Vocational Expert

During Thomas' hearing on February 4, 2009, ALJ Benitz asked the VE to consider whether a hypothetical individual in Thomas' situation would be able to perform jobs that exist in significant numbers in the national economy. (*Id.* at 24, 47–49.) Specifically, ALJ Benitz asked the VE to consider an individual with an eighth-grade education; someone who was limited to unskilled jobs involving low stress, low concentration, and low memory; who can lift ten pounds frequently and twenty pounds on occasion; who can stand and sit for thirty minutes on an alternate basis throughout the workday; who has difficulty pushing, pulling, and gripping with the left upper extremity; who must avoid heights, hazardous machinery, temperature extremes, and repetitive neck turning; and who must have ready access to a bathroom. (*Id.* at

48.) The VE testified that such an individual would not be able to return to Thomas' past relevant work as a concrete mason. (*Id.* at 49.) However, the VE also assessed that such an individual would be able to perform work in multiple jobs, including: a security monitor, a sedentary job with 90,000 positions nationally; an order clerk, a sedentary job with 70,000 positions nationally;[3] an information clerk, a sedentary job with 50,000 positions nationally; and a non-governmental mail room clerk, a light job with 95,000 positions nationally. (*Id.* at 48–49.)

### C. The ALJ's Decision

On March 27, 2009, ALJ Benitz issued a written decision concluding that Thomas was not disabled, and therefore not entitled to DIB. (*Id.* at 9–25.) To arrive at this conclusion, ALJ Benitz conducted the standard five-step procedure to determine the existence of disability pursuant to SSA regulations. (*Id.*) His findings are summarized as follows:

1. Thomas meets the insured status requirements of the SSA through March 31, 2009.

2. Thomas has not engaged in substantial gainful activity since January 1, 2006, the alleged onset date (20 C.F.R. § 404.1571 et seq.).

3. Thomas has the following severe impairments: degenerative disc disease, status post rotator cuff tear surgery secondary to traumatic injury, Crohn's disease, cervical spondylosis, and lumbar facet arthropathy (20 C.F.R. § 404.1521 et seq.).

4. Thomas does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526).

5. Thomas has the RFC to perform simple, routine, unskilled low concentration, low memory, low stress light work as defined in 20 C.F.R. § 404.1567(b) except that he can lift twenty pounds occasionally, ten pounds frequently; he can stand for thirty minutes and sit for thirty minutes consistently on an alternate basis eight hours a day, five days a week; he must avoid heights, hazardous machinery, temperature extremes, ladders and stair climbing; he cannot repetitively turn his neck; he is mildly limited to push, pull and grip in the left upper extremity and mildly to push and pull in the lower left extremity; he must have ready access to a bathroom; and he can attend to tasks and maintain schedules.

---

[3] In his testimony, the VE mistakenly identified the order clerk job as light work, when in fact, under the DOT, the job is classified as sedentary work. (D.I. 11 at 48–49); DOT 209.567-014.

6. Thomas is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. Thomas was born on February 26, 1959. At the time of his alleged disability onset date, he was forty-six years, and therefore categorized as a younger individual age 18–49. Thomas subsequently changed age category to a person closely approaching advanced age (20 C.F.R. § 404.1563).

8. Thomas has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Thomas is "not disabled," whether or not he has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering Thomas' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform (20 C.F.R. § 404.1569, 404.1569(a)).

11. Thomas has not been under a disability, as defined in the Social Security Act, from January 1, 2006 through March 27, 2009 (20 C.F.R. § 404.1520(g)).

(*Id.* at 11–24.)

In reaching these conclusions, ALJ Benitz assigned "great weight" to Dr. Bandera's August 13, 2007 opinion, but "little weight" to his subsequent clinical notes and his RFC questionnaire. (*Id.* at 22.) ALJ Benitz also assigned "some weight" to Dr. Jain's opinions as to Thomas' lifting, stress-tolerance, and toileting limitations, but generally disregarded Dr. Jain's assertions of functional limitations which did not appear to have a nexus to Thomas' symptoms. (*Id.* at 23.) Finally, ALJ Benitz assigned "some weight" to Dr. Palandjian's opinion concerning Thomas' lifting ability and his need to avoid temperature extremes and hazards. (*Id.* at 22–23.)

On May 14, 2009, Thomas filed a request to have the ALJ's decision reviewed by the Appeals Council, alleging that the decision was not based on substantial evidence. (*Id.* at 5.)

The request for review was denied on May 26, 2011.[4]  (*Id.* at 1–3.)  Thomas then filed this timely appeal on June 22, 2011 seeking review of the final decision.  (D.I. 2 at 1.)

## III.   LEGAL STANDARDS

### A.    Review of an Agency Decision

If an ALJ's findings are supported by "substantial evidence," the court must consider those findings "conclusive" and may not overturn them.  *See* 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *see also Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence [the court is] bound by those findings, even if [it] would have decided the factual issue differently.").  Evidence will be considered "substantial" if it amounts to "more than a mere scintilla" or if "a reasonable mind might accept [it] as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Thus, the substantial evidence standard may be satisfied even if the supporting evidence amounts to "somewhat less than a preponderance" of the evidence as a whole.  *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)).

In determining whether substantial evidence existed, a reviewing court may not undertake *de novo* review of an ALJ's decision, nor may it re-weigh the evidence of record.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  Additionally, a court is constrained to look only at the evidence that was presented to SSA during the prior administrative proceedings.  *See Matthews*, 239 F.3d at 593–95.  "Overall, the substantial evidence standard is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by

---

[4] Pursuant to 20 C.F.R. §§ 404.955 and .981, upon the Appeals Council's denial of review, the ALJ's decision became the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 106–07 (2008); *see also Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).

14

substantial evidence." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999) (citing *Monsour*, 806 F.2d at 1190–91).

## B. Disability Determination

To qualify for DIB, a claimant must be "under a disability" as defined by the Social Security Act. 42 U.S.C. § 423(a)(1)(E). A "disability," according to the Act, is an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at § 423(d)(1)(A). A disabled individual must "not only [be] unable to do his previous work" but also unable to "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 423(d)(2)(A)). "Work which exists in the national economy" is further defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

## IV. DISCUSSION

Thomas contends that ALJ Benitz's decision was flawed because (1) for numerous reasons, the ALJ's disability determination was not supported by substantial evidence; and (2) the ALJ failed in his duty to develop the record. (D.I. 14 at 1.) After considering the parties' submissions and arguments, the applicable law, and the record evidence, the court disagrees with Thomas' contentions and finds that the ALJ's decision was supported by substantial evidence and the ALJ did not fail in his duty to develop the record. The court's reasoning follows.

### A. ALJ's Disability Determination

To determine whether a claimant suffers from a physical or mental disability, an ALJ must follow the SSA's five-step sequential evaluation process. *Fraser v. Astrue*, 373 F. App'x

222, 224 (3d Cir. 2010); 20 C.F.R. § 404.1520. The process directs an ALJ to consider: (1) the claimant's current work activity; (2) the medical severity and duration of the claimant's impairments; (3) whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations; (4) whether the claimant has the RFC to return to past relevant work; and (5) if the claimant cannot return to past relevant work, whether, in light of vocational factors including age, education, and work experience, he or she can make an adjustment to other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v)). The claimant bears the burden of proof on steps one through four but the Commissioner bears the burden of proof at step five. *Id.*; *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014). SSA evaluates each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See id.* at § 404.1520(a). If the Commissioner's disability determination was supported by substantial evidence, it must be upheld. *See, e.g.*, 42 U.S.C. § 405(g); *Williams*, 970 F.2d at 1182.

The parties do not dispute the ALJ's findings at steps one, three, and four. They do, however, dispute the findings at steps two and five.

### 1.    Step Two

At step two, ALJ Benitz found that Thomas has four severe impairments including degenerative disc disease, Crohn's disease, cervical spondylosis, and lumbar facet arthopathy. (D.I. 11 at 11.) ALJ Benitz also determined that all of Thomas' other alleged impairments were not severe. (*Id.* at 15.) Thomas, however, maintains that his left knee impairment and depression were, in fact, severe. (D.I. 14 at 16.) The court disagrees with Thomas' position.

An impairment will be considered "severe" only if it significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521.

16

It is the claimant's burden to prove this significant limitation. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). If the claimant fails to prove a significant limitation of the ability to perform basic work activities, the impairment must be found not severe. 20 C.F.R. § 404.1521(a).

Here, ALJ Benitz found that Thomas' knee impairment did not significantly limit his ability to perform basic work activities. (D.I. 11 at 15.) Thomas' testimony in February 2009 indicated that he had no difficulty standing, that he is able to drive his car on a daily basis, and that his knee "feels pretty good." (*Id.* at 15, 39, 41, 47.) Additionally, Dr. Bandera noted that by April 2008, the swelling and tenderness in Thomas' left knee had reduced, and he omitted Thomas' left knee impairment in subsequent assessments of his condition. (*Id.* at 15, 266–67.) As such, the court finds ALJ Benitz's conclusion was reasonable and supported by substantial evidence.

ALJ Benitz also found that Thomas' depression causes only "mild" limitations in his ability to perform basic activities of daily living, social functioning, and concentration, and that these limitations did not rise to the required level of "significant." (*Id.* at 16.) In support of these findings, ALJ Benitz referenced physician accounts of Thomas' symptoms, Thomas' testimony of February 4, 2009, which failed to mention depressive symptoms, and Thomas' discontinuation of treatment and medication. (*Id.* at 17.) The court finds that ALJ Benitz's conclusion that Thomas' depression was not a severe impairment was supported by substantial evidence.

### 2. Step Five

At step five, ALJ Benitz found that, in light of Thomas' age, education, work experience, and RFC, Thomas can perform jobs that exist in significant numbers in the national economy. (*Id.* at 24.) Thomas argues that ALJ Benitz's findings at step five were not supported by substantial evidence for three primary reasons. (D.I. 14 at 1, 3–19.) First, Thomas contends that

17

ALJ Benitz's RFC assessment and corresponding VE hypothetical could not constitute substantial evidence supporting a finding of no disability because neither included all of Thomas' established limitations. (*Id.* at 1, 3–9, 16–17.) Second, Thomas contends that improperly weighed the medical evidence of record; that he substituted his judgment for that of the medical experts; and that his credibility analysis does not comply with agency requirements. (*Id.* at 1, 9–15.) Third, Thomas contends that there are conflicts between the VE's testimony and the Department of Labor's Dictionary of Occupational Titles ("DOT"). (*Id.* at 1, 18–19.) The court rejects these contentions.

### a. RFC and VE Hypothetical

Thomas' first primary argument against ALJ Benitz's finding at step five is that the RFC and VE hypothetical, which constituted the substantial evidence on which the finding was based, did not include all of Thomas' established limitations. (*Id.* at 1, 3–9.) Specifically, Thomas contends (i) that ALJ Benitz failed to adequately account for toileting limitations arising from his Crohn's disease; (ii) that ALJ Benitz failed to address Thomas' reaching and (iii) climbing limitations arising from his lingering musculoskeletal issues; and (iv) that ALJ Benitz improperly ignored limitations arising from Thomas' non severe medical impairments, including his knee issues and depression. (*Id.*) The court rejects each of these contentions.

A claimant's RFC is defined as "the most [he or she] can do despite [his or her] limitations. 20 C.F.R. § 404.1545(a). In determining the scope of a claimant's RFC, SSA will consider "all the relevant evidence," including medical records, expert opinions, the claimant's own testimony, and any other evidence that sheds light on the claimant's physical and mental abilities. *Id.* But while all evidence must be *considered*, it need not all be given the same weight. *Id.* (emphasis added). The final responsibility for making findings of fact and

conclusions of law as to the scope of a claimant's RFC lies with the Commissioner. *Id.* at §
404.1546(c); *Breen v. Comm'r of Soc. Sec.*, 504 F. App'x 96, 99 (3d Cir. 2012). In the context
of an ALJ hearing, that responsibility lies with the ALJ. 20 C.F.R. § 404.1546. After weighing
the evidence, it is within the ALJ's authority to exclude unproven limitations from the RFC, so
long as the ALJ has substantial evidence to support such exclusion. *See Breen*, 504 F. App'x at
99; *see also Wilkinson v. Comm'r Soc. Sec.*, 558 F. App'x 254, 256 (3d Cir. 2014).

Similarly, in a corresponding VE hypothetical, "where a limitation is supported by
medical evidence, but is opposed by other evidence in the record, the ALJ has discretion to
choose whether to include that limitation in the hypothetical." *Zirnsak*, 777 F.3d at 615 (citing
*Rutherford*, 399 F.3d at 554)). There is no requirement that a VE hypothetical include every
impairment alleged by the claimant. *Rutherford*, 399 F.3d at 554. Rather, for a VE's testimony
constitute substantial evidence, the ALJ's hypothetical simply must "accurately portray" the
claimant's impairments while including all "credibly established limitations." *Id.* (citing
*Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir.1984); *Plummer v. Apfel*, 186 F.3d 422, 431
(3d Cir. 1999)).

### i. Toileting Limitation

Thomas contends that the VE hypothetical did not adequately account for his toileting
limitations arising from his Crohn's disease. (D.I 14 at 3–5.) Specifically, Thomas argues that
the VE hypothetical should have provided for a minimum frequency and duration for his
bathroom visits, not merely "ready access to a bathroom." (*Id.*) The Commissioner responds
that Thomas is simply nitpicking the semantics of the hypothetical, and that "ready access to a
bathroom" would accommodate a person in Thomas' situation. The court agrees with the
Commissioner. Dr. Jain opined that, during a typical eight-hour workday, Thomas would require

three to four unscheduled bathroom breaks of fifteen minutes in duration. (D.I. 11 at 288–89.) ALJ Benitz assigned some weight to that opinion. (*Id.* at 23.) Considering the breaks SSA regards as built-in to an eight-hour workday,[5] there is substantial evidence that the stipulation providing for "ready access to a bathroom" would accommodate an individual who required frequent—*e.g.*, three to four—bathroom breaks daily, even if some of these breaks were unscheduled. The court finds that the "ready access to a bathroom" requirement accurately and sufficiently captured Thomas' credibly established toileting limitation.

### ii.     Reaching and Handling Limitations

Thomas also contends that the VE hypothetical did not adequately account for his reaching and handling limitations associated with his musculoskeletal impairments. (D.I. 14 at 5–8.) Specifically, he objects to ALJ Benitz's exclusion of right upper extremity and reaching limitations from the RFC and VE hypothetical, and his characterization of Thomas' left upper extremity limitations as "mild." (*Id.* at 6–7.) The court finds, however, this exclusion and characterization were justified by substantial evidence.

After weighing the various medical opinions and record evidence, ALJ Benitz found that "the medical record as a whole does not support a conclusion that [Thomas'] ability to left, push and pull or handle materials is affected in his right arm." (D.I. 11 at 19.) He also found that Thomas' lingering impairments merely "reduced" and did not eliminate his functional ability in his left shoulder; and that, after July 2003, no more recent imaging studies were submitted to corroborate the current extent of his left arm limitations. (*Id.*) Moreover, Thomas testified that he is able to operate a motor vehicle on a daily basis, suggesting that any limitation of his reaching and handling ability would have to be mild enough to accommodate that activity. (*Id.*

---

[5] An eight-hour workday consists of a morning break, a lunch period, and an afternoon break at roughly two-hour intervals. *See* SSR 96-9p, 1996 WL 374185, at * 6 (July 2, 1996). A person in Thomas' situation would be able to use the bathroom at those times, limiting the need for bathroom breaks outside of scheduled break times.

at 39.) The court finds that a reasonable mind might accept this evidence as adequate to support the conclusion that Thomas is not limited in his ability to use his right arm and that his limitations in using his right arm are "mild." *See Richardson*, 402 F.2d at 401.

### iii.    Climbing Limitation

Thomas argues that remand is required because of a discrepancy between the RFC and VE hypothetical pertaining to ladder- and stair-climbing restrictions. (D.I. 14 at 8–9.) ALJ Benitz's RFC provided that Thomas should "[avoid] . . . ladders and stair climbing," but the hypothetical posed to VE Melanson did not include that restriction. (D.I. 11 at 17, 48.) Thomas contends that the VE's testimony cannot constitute substantial evidence because it did not respond to a hypothetical including all of Thomas' climbing restrictions. (D.I. 14 at 8–9.) The court recognizes that ALJ Benitz erred by failing to include climbing restrictions in the VE hypothetical, but this error was harmless. "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) (citing *Renchenski v. Williams*, 622 F.3d 315, 341 (3d Cir. 2010)). Here, even if the VE hypothetical included a climbing restriction, the outcome would not have changed. Among the jobs included in the VE's testimony was a mail room clerk—a job which does not require climbing and constitutes 95,000 jobs in the national economy. (D.I. 11 at 48–49.) The number of available jobs would not, as Thomas suggests, need to be reduced by the number of workplaces that have stairs between their work area and the closest bathroom because ALJ Benitz's RFC merely states that Thomas should *avoid* climbing ladders or stairs. (D.I. 11 at 17.) It does not state that Thomas is completely incapable of climbing stairs to access a bathroom and, in fact, Dr. Bandera and Dr. Jain both opined that Thomas would be able to occasionally climb stairs. (*Id.* at 17, 285, 289.) Thomas

has not put forth a valid reason why ALJ Benitz's inclusion of a climbing restriction in the VE hypothetical would have compelled a different result.

### iv. Non-severe Limitations

Next, Thomas argues that ALJ Benitz erred by failing to consider at step five the functional effects of Thomas' "not severe" impairments—depression and left knee injury. (D.I. 14 at 1, 16–17.) The court finds no error. The functional effects of impairments found not severe at step two must be considered in the remainder of the disability analysis only if they are part of a group of impairments that, when combined, have a medically severe effect. 20 C.F.R. § 404.1523. Thomas' non-severe depression and left knee impairments stand alone; they are not part of a group of impairments that, when combined, have a medically severe effect. Moreover, as discussed *supra* in connection with step two, there was substantial evidence that Thomas' depression and left knee impairment did not give rise to credibly established limitations. (D.I. 11 at 15–17.)

### b. Credibility Determinations

Thomas' second primary argument against ALJ Benitz's findings at step five is that ALJ Benitz failed to properly weigh, analyze, and assess the credibility of the evidence presented. (D.I. 14 at 1, 9–16.) Thomas asserts that ALJ Benitz violated agency standards by substituting his own judgment for that of the medical experts, failing to properly weigh the opinions of medical experts, and discounting the credibility of Thomas' own testimony. (*Id.*) The court disagrees.

In a hearing to determine disability status before an ALJ, the ALJ is the finder of fact; evidence weighing and credibility assessments are exclusively the province of the ALJ. *See* 20 C.F.R. §§ 404.1520b, 404.1527; *see also Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *2

(E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). A reviewing court will generally defer to an ALJ's evaluation of the factual evidence and the credibility of witnesses. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 506 (3d Cir. 2009) ("In determining whether there is substantial evidence to support an [ALJ's] decision, we owe deference to his evaluation of the evidence, assessment of the credibility of witnesses, and reconciliation of conflicting expert opinions."). An ALJ is free to favor one witness' opinion over that of another. *See id.* at 505 (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). However, "[w]hen a conflict in the evidence exists, the ALJ . . . cannot reject evidence for no reason or for the wrong reason." *Id.* (quoting *Plummer*, 186 F.3d at 429).

### i. Medical Opinions

ALJ Benitz's evaluation of the medical evidence did not violate agency standards. Determinations of a claimant's disabled status and ability to work "are not medical issues . . . but are administrative findings that are dispositive of a case." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). As such, medical experts' opinions on these subjects are not binding. 20 C.F.R. § 404.1527(d). The opinions of medical experts are entitled to enhanced weight only if there are reasons to support such an enhancement.[6] 20 C.F.R. § 404.1527(c). If, however, a medical expert's testimony is not consistent with the medical record as a whole—*i.e.*, if there is contradictory medical evidence—an ALJ may afford less weight to a medical expert's opinion or reject it outright. *See Plummer*, 186 F.3d at 429; *see also Brown*, 649 F.3d at 195.

---

[6] ALJs will consider all of the following factors in determining the weight to give a medical source's opinion: (1) whether the source has examined the claimant; (2) whether the source has treated the patient, and the length, nature, and extent of the treating relationship; (3) the degree to which the source has presented relevant evidence to support the opinion; (4) the degree to which the source's opinion is consistent with the record as a whole; (5) whether the source specializes in the relevant medical area; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

Here, ALJ Benitz allocated weight to the various medical expert opinions in accordance with the relevant legal standards. ALJ Benitz assigned little weight to Dr. Bandera's opinion in part because it "provides much more restrictive limitations that [sic] are reflected in his treatment findings." (D.I. 11 at 22.) The record supports this observation. Evidence from Dr. Bandera exhibited numerous contradictions. For example, on December 10, 2007, Dr. Bandera indicated that a functional examination of Thomas revealed "advanced problems on basic push/pull activities, ambulation, sitting, material handling." (*Id.* at 269.) However, he also indicated that his course of therapy "has allowed him to do basic activities of daily living." (*Id.*) Similarly, in his RFC questionnaire, Dr. Bandera opined that Thomas would be able to twist, stoop, squat, and climb ladders and stairs "occasionally"—or up to one-third of the workday. (*Id.* at 285.) Yet, in the same questionnaire, he suggested that Thomas is essentially bedridden—that he could neither sit nor stand/walk for two hours or more in an eight-hour workday. (*Id.* at 283.) Such inconsistencies are legitimate grounds for doubt. Accordingly, ALJ Benitz afforded Dr. Bandera's opinions little weight.

ALJ Benitz's treatment of Dr. Jain's opinion was also appropriate. ALJ Benitz accepted Dr. Jain's assessment of Thomas' lifting and carrying limitations and his need for ready access to a bathroom. (*Id.* at 23.) But he rejected Dr. Jain's other limitations because they did not appear to have a nexus to the claimant's Crohn's disease symptoms, and they were "not consistent with the medical record as a whole." (*Id.*) These conclusions were warranted. Like Dr. Bandera, Dr. Jain opined that Thomas would be able to twist, stoop, squat, and climb ladders and stairs up to one-third of the workday, but that—paradoxically—he would only be able to sit or stand/walk for about two hours. (*Id.* at 289.) Additionally, since Dr. Jain is a gastroenterologist, ALJ Benitz was justified in focusing the probative weight of Dr. Jain's opinions on issues that pertained to

Thomas' gastrointestinal impairments. *See* 20 C.F.R. § 404.1527(c)(5). Dr. Jain's opinions as to Thomas' limitations connected to his musculoskeletal impairments appropriately merited less weight. *Id.*

ALJ Benitz's evaluation of Dr. Palandjian's opinion was appropriate as well. ALJ Benitz afforded some weight to Dr. Palandjian's opinion as to Thomas lifting and carrying restrictions and his need to avoid temperature extremes and hazards. (D.I. 11 at 22.) However, he afforded little weight to Dr. Palandjian's opinion of Thomas' remaining limitations because he did not have an opportunity to review the medical record beyond June 2007, and therefore was unable to consider treatment notes that showed improvement in Thomas' condition. (*Id.* at 23.) The court does not find error in ALJ Benitz's judgment.

### ii.    Thomas' Testimony.

The court also finds that ALJ Benitz appropriately assessed Thomas' credibility. In determining the credibility of a claimant's subjective account of his symptoms, the ALJ first considers "all . . . symptoms, including pain, and the extent to which [these] symptoms can reasonably be accepted as consistent with objective medical evidence . . . ." 20 C.F.R. § 404.1529(a); *Seney v. Comm'r Soc. Sec.*, 585 F. App'x 805, 808 (3d Cir. 2014). Next, the ALJ will evaluate the intensity and persistence of the claimant's symptoms and the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c)(1); *Seney*, 585 F. App'x at 808. If the claimant's portrayal of his symptoms is not substantiated by objective medical evidence, the ALJ must assess the claimant's credibility based on consideration of the entire case record. 20 C.F.R. § 404.1529(c)(3).

Here, ALJ Benitz reasonably concluded that Thomas' statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible. (D.I. 11 at 21.) In

25

light of discrepancies between Thomas' testimony and the observations of his treating physicians, as well as the lack of objective medical evidence substantiating the claimed severity of his impairments, the court agrees with ALJ Benitz's credibility determination.

### c. Conflicts Between VE Testimony and the DOT

Thomas also argues that ALJ Benitz's findings at step five were flawed because there are unresolved conflicts between the VE testimony and the DOT. (D.I. 14 at 18–19.) Specifically, Thomas contends that one of the jobs the VE identified—order clerk—is a sedentary job, not a light job, and therefore is inconsistent with the ALJ's hypothetical question. (*Id.* at 18.) He also contends the jobs the VE identified are both "reasoning level 3 jobs," which require more than "simple, routine tasks" and are thus beyond Thomas' functional capacity—determined to be at Specific Vocational Preparation ("SVP") level one or two. (*Id.* at 19.) The court rejects these contentions.

"As a general rule, occupational evidence provided by a VE should be consistent with the occupational evidence presented in the DOT." *Zirnsak*, 777 F.3d at 617 (citing SSR 00–4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). However, "the presence of inconsistencies does not *mandate* remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id.* at 617 (emphasis in original) (quoting *Boone v. Barnhart*, 353 F.3d 203, 209 (3d Cir. 2004)).

Here, despite the existence of minor inconsistencies, ALJ Benitz's determination is fully supported by substantial evidence in the record. Thomas was found to be able to perform some sedentary and light work activities, provided they were "simple, routine, and unskilled," and in compliance with the additional limitations adopted from his RFC.[7] (D.I. 11 at 24, 47–48.)

---

[7] Thomas reached his fiftieth birthday prior to ALJ Benitz's decision, and thus is classified as a "person closely approaching advanced age." *See* 20 C.F.R. § 404.1563. As such, to be found not disabled, Thomas must be

Despite the fact that the VE misidentified the order clerk job as a light position, when it is in fact a sedentary position, Thomas was still found able to perform the other identified light position—the mail clerk job, of which there are 95,000 positions in the national economy. (*Id.* at 48–49); DOT 209.567-014. The court finds that the elimination of order clerk from the realm of alternative work possibilities does not sufficiently limit the occupational base to warrant remand.

Moreover, the court notes "there is no bright-line rule stating whether there is a per se conflict between a job that requires level 3 reasoning and a finding that a claimant should be limited to simple and routine work." *Zirnsak*, 777 F.3d at 618. Jobs listed in VE testimony are intended only as "representative examples—not an exhaustive list—of jobs that the claimant was capable of performing." *Id.* (citing *Simpson v. Astrue*, No. 10-2874, 2011 WL 1883124, at *8 (E.D. Pa. May 17, 2011); *Rutherford*, 399 F.3d at 557). Thomas' counsel had an opportunity to raise the reasoning level issue at the hearing before the ALJ and he did not do so. The court finds that "any perceived inconsistency between a limitation to 'simple, routine tasks' and a reasoning level of 3 is 'simply not egregious enough-either in number or in substance-to bring into question the ALJ's reliance on the expert testimony as a whole.'" *Simpson*, 2011 WL 1883124, at *8 (quoting *Young v. Astrue*, No. 09-2834, 2010 WL 2135627, at *7 (E.D. Pa. May 26, 2010).

### B. Duty to Develop the Record

Thomas' final argument is that ALJ Benitz failed in his duty to develop the record. (D.I. 14 at 1, 17–18.) Thomas contends that ALJ Benitz violated agency standards by failing to order additional imaging studies and by failing to order a medical review of Thomas' mental health impairments. (*Id.*) The court finds no such violation.

---

found able to perform at least light work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.10. VE testimony which finds Thomas capable of sedentary work alone cannot constitute substantial evidence supporting a finding of not disabled. *Id.*

It is indeed the ALJ's duty to "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. However, the government correctly points out that the ALJ's "only duty in this respect is to ensure that the claimant's complete medical history is developed on the record before finding that the claimant is not disabled." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) (citing 20 C.F.R. § 404.1512(d)). "The burden lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition." *Id.* (citing *Bowen*, 482 U.S. at 146, n.5).

The court finds that the record here was sufficiently developed, and that neither further imaging studies nor a mental health case review were required for the ALJ to render a decision.

## V.    CONCLUSION

The findings of ALJ Benitz, made final by the Commissioner, were supported by evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 F.2d at 401. Thus, the court grants the Commissioner's motion for summary judgment (D.I. 16) and denies Thomas' motion for summary judgment. (D.I. 14.) An appropriate Order will issue.

Dated: July 21, 2015

UNITED STATES DISTRICT JUDGE